## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SOUTHWEST AIRLINES CO.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **AIRCRAFT MECHANICS FRATERNAL** | § | **CIVIL ACTION NO. 3:17-cv-00431-N** |
| **ASSOCIATION; BRET OESTREICH;** | § | |
| **GENE PAINTER; AIRCRAFT** | § | |
| **MECHANICS FRATERNAL** | § | |
| **ASSOCIATION, LOCAL 11; EARL** | § | |
| **CLARK; MICHAEL NELSON; ROBERT** | § | |
| **CRAMER; CRAIG HAMLET; SHANE** | § | |
| **FLACHMAN; and MICHAEL YOUNG,** | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SOUTHWEST AIRLINES CO.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF UNDISPUTED FACTS .................................................... 2

    A.   Southwest Airlines Co. ........................................................................... 2

    B.   AMFA and the Individual Defendants .................................................. 2

    C.   The Overtime-Refusal Job Action ......................................................... 4

        1.   Statistical evidence of the job action. ....................................... 5

        2.   Other evidence of the job action ................................................ 7

        3.   The intended purpose of the job action ..................................... 9

    D.   The Emergency Created by the Job Action ......................................... 10

    E.   Southwest's Response to the Job Action ............................................. 11

    F.   Defendants' Failure to Prevent or Halt the Job Action ....................... 13

III.  STANDARD ...................................................................................................... 14

    A.   Summary Judgment ............................................................................... 14

    B.   Permanent Injunctive Relief ................................................................ 15

IV.   ARGUMENT ..................................................................................................... 16

    A.   Defendants' Deficient Actions Violate the Core Provisions of the RLA
         Intended to Preserve and Protect Interstate Transportation ................ 16

        1.   Defendants' issuance of a single, ineffective communication does
           not satisfy the RLA's "every reasonable effort" standard. ..... 16

        2.   AMFA's National and Local leadership failed to coordinate an
           appropriate response to the overtime refusal ........................... 18

        3.   Multiple other available steps were totally ignored by Defendants ........ 22

    B.   Southwest Is Entitled to Injunctive Relief ......................................... 23

        1.   Southwest is entitled to judgment in its favor on the merits of its
           Section 2, First, claim against AMFA and the individual
           Defendants ................................................................................ 24

        2.   Although not required to do so, Southwest can show that it will
           suffer irreparable injury absent injunctive relief ..................... 24

        3.   The balance of the equities weighs heavily in Southwest's favor .......... 25

        4.   Absent injunctive relief, future Union job actions are likely to
           harm the general public ............................................................ 26

# TABLE OF CONTENTS
## (continued)

**Page**

      5.    The Court should issue a prospective injunction that prohibits AMFA from engaging in any further unlawful job actions ..................... 26

C.    The Norris-LaGuardia Act Does Not Limit Southwest's Potential Relief ......... 27

V.    CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airline Prof'ls Ass'n, Teamster Local Union 1224 v. ABX Air, Inc.*,
  400 F.3d 411 (6th Cir. 2005) ................................................16

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
  394 U.S. 369 (1969)................................................17

*Brown v. City of Houston*,
  337 F.3d 539 (5th Cir. 2003) ................................................14

*Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*,
  143 F. Supp. 2d 672 (N.D. Tex. 2001) ...........................................15, 27

*Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*,
  286 F.3d 803 (5th Cir. 2002) ................................................15, 27

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ................................................15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................14

*Chicago & N.W. Ry. Co. v. United Transp. Union*,
  402 U.S. 570 (1971)................................................17

*Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*,
  491 U.S. 299 (1989)................................................15, 24

*Deep Marine Tech., Inc. v. Conmaco/Rector, L.P.*,
  515 F. Supp. 2d 760 (S.D. Tex. 2007) ................................................14

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
  238 F.3d 1300 (11th Cir. 2001) ................................................ *passim*

*Elgin, J. & E. Ry. Co. v. Burley*,
  325 U.S. 711 (1945)................................................14

*In re Northwest Airlines Corp.*,
  483 F.3d 160 (2d Cir. 2007)................................................27

*Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
  281 U.S. 548 (1930)................................................16

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
    563 F.3d 257 (7th Cir. 2009) ..............................................................................17, 18

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
    No. 08 CV 4317, 2008 WL 4936847 (N.D. Ill. Nov. 17, 2008)...............................18

*United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers,*
    243 F.3d 349 (7th Cir. 2001) ...............................................................16, 23, 24, 28

*US Airways, Inc. v. U.S. Airline Pilots Ass'n,*
    813 F. Supp. 2d 710 (W.D.N.C. 2011) ............................................................15, 23

**Statutes**

29 U.S.C. §§ 101 et seq.....................................................................................................27

29 U.S.C. § 107.................................................................................................................28

45 U.S.C. § 151....................................................................................................2, 16, 26

45 U.S.C. § 152........................................................................................2, 10, 17, 28

45 U.S.C. § 181...................................................................................................................2

Norris-LaGuardia Act ..........................................................................................27, 28, 29

Railway Labor Act .......................................................................................................1, 17

**Other Authorities**

51B C.J.S. *Labor Relations* § 1068 (Dec. 2017) ...........................................................28

## I.        INTRODUCTION

On or about February 10, 2017, the Aircraft Mechanics Fraternal Association ("AMFA" or the "Union") and its members engaged in an unlawful overtime boycott that triggered a flight operations emergency on par with a major hurricane, blizzard, or other mass grounding event at Southwest Airlines Co. ("Southwest").   AMFA and its members knew an unlawful coordinated overtime boycott would disrupt Southwest's aircraft maintenance programs and put pressure on the company during negotiations.   Specifically, AMFA and its members knew that Southwest necessarily relies on utilizing regular levels of overtime to meet operational needs and execute the published flight schedule.   In a matter of hours, Southwest saw as much as a 76.6% drop in overtime participation by AMFA-represented mechanics across bases scattered throughout the United States.   This widespread and severe overtime boycott triggered a domino effect across Southwest's maintenance operations.   By the end of the day on February 10, 2017, the AMFA boycott directly threatened Southwest's ability to deploy adequate aircraft to service scheduled flights and risked cascading maintenance delays across the fleet.

In short, AMFA and its membership, including AMFA's Dallas-based Local 11 and each of the individual Defendants (collectively, "Defendants"), decided to take matters into their own hands—and out of the hands of the National Mediation Board—by holding the flying public hostage.   This activity directly violated the Railway Labor Act.

Nonetheless, when AMFA was notified by Southwest of the job action on February 10, 2017, AMFA decided to do nothing for two days.   Then, when it finally took action, AMFA decided not to make use of any of the mechanisms it had successfully used in the past to disperse such unlawful activity.   Instead, AMFA electronically posted one letter to its national website and social media and allowed the overtime boycott to continue for another eight days.

These undisputed facts establish that Defendants failed to "exert every reasonable effort" to prevent, to stop, or to mitigate the effect of the overtime refusal, as required by 45 U.S.C. § 152, First.  Thus, Southwest is entitled to summary judgment on Count III of its Complaint.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Southwest Airlines Co.

Southwest is one of the largest scheduled passenger airlines in the world and the largest carrier in the United States in terms of originating domestic passengers boarded.[1]  Southwest serves a network of over 100 destinations across the United States and eight additional countries with approximately 3,900 departures a day during peak travel season.[2]  Southwest employs more than 56,000 individuals, and serves over 145 million customers annually.[3]  In that capacity, Southwest is a "common carrier" by air engaged in interstate or foreign commerce under 45 U.S.C. § 181.  Southwest is thus subject to the provisions of the Railway Labor Act ("RLA").

### B.   AMFA and the Individual Defendants

AMFA is a representative or labor union within the definition of the RLA, 45 U.S.C. § 151, Sixth.  The National Mediation Board ("NMB") has certified AMFA to be the exclusive, nationwide collective bargaining representative of Southwest's approximately 2,400 mechanics and related employees.[4]  AMFA Local 11 is the Dallas-based organization that, in some respects, operates within the structure of AMFA's "National" apparatus.[5]

The individual Defendants are national and local AMFA officers who serve or served in their positions under AMFA's Constitution:

- Bret Oestreich is AMFA's National Director;

---

[1] Pl.'s App. 1-2 at ¶ 3.
[2] Pl.'s App. 1-2 at ¶ 3.
[3] Pl.'s App. 1-2 at ¶ 3.
[4] Pl.'s App. 2 at ¶ 4.
[5] Pl.'s App. 2 at ¶ 4.

-2-

- Gene Painter is AMFA's Assistant National Director;

- Earl Clark is AMFA's Region I Director;

- Michael Nelson served as AMFA's Interim Region II Director;

- Robert Cramer is the Airline Representative for AMFA's Local 4;

- Craig Hamlet is the Airline Representative for AMFA's Local 11;

- Shane Flachman was the Airline Representative for AMFA's Local 18 during the operative period; and

- Michael Young was the Airline Representative for AMFA's Local 32 during the operative period.[6]

Four of the individual Defendants in this case—Cramer, Hamlet, Flachman, and Young—serve (or served during the operative period) as "Airline Representatives" with AMFA Locals 4, 11, 18, and 32, respectively.[7] As Airline Representatives, these individuals wield significant authority over their respective Locals.[8] AMFA's Local Shop and Area Representatives—the AMFA representatives who deal most directly with rank-and-file membership on day-to-day issues in their workplaces throughout the country—report to the Local Airline Representatives.[9] Notably, AMFA's four Local Airline Representatives are also tasked with formulating and implementing AMFA's collective bargaining strategy for the Southwest nationwide bargaining unit.[10] Defendants Oestreich, Painter, and Clark—as members of AMFA's national leadership structure—bear responsibilities such as "presiding over the daily

---

[6] Pl.'s App. 2 at ¶ 5.
[7] Pl.'s App. 21 (9:16-17); Pl.'s App. 26 (10:1-2); Pl.'s App. 34 (8:16-19); Pl.'s App. 47 (10:9-12).
[8] Pl.'s App. 60-61; Pl.'s App. 27 (17:1-24).
[9] Pl.'s App. 74-75 (47:12-48:7).
[10] Pl.'s App. 60-61.

operations of [the Union],"[11] enforcing the Union's Constitution,[12] and "maintain[ing] frequent contact with all the Locals" within a region.[13]

### C.      The Overtime-Refusal Job Action

On the morning of Friday, February 10, 2017, Southwest's maintenance directors met as they do every morning for their daily technical operations "breakfast club" meeting to discuss the short- and long-term maintenance needs of Southwest's aircraft fleet.[14]  But that day's breakfast club meeting would be different.  Reports had starting coming in that Southwest was about to be beset by an illegal overtime boycott intended to bring airline operations to a halt.  The maintenance directors knew that such an action would immediately set in motion a system-wide crisis as Southwest began observing a major drop in the number of AMFA members signing up for voluntary overtime maintenance shifts at several of Southwest's maintenance facilities across the country.[15]

Voluntary overtime is a critically important component of Southwest's maintenance program and, by extension, Southwest's ability to meet its scheduled flight commitments. Southwest operates approximately 4,000 flights each day, and a consistent level of aircraft maintenance overtime work is necessary to ensure that those flights depart on time and arrive as scheduled.[16]  Unlike other sectors, a loss of overtime participation can—very literally—bring airline operations to a halt.  Thus, Southwest specifically bargained for and maintains a robust overtime program that it expects to provide as much as 10-12% of its total maintenance hours on

---

[11] Pl.'s App. 57.
[12] Pl.'s App. 57.
[13] Pl.'s App. 58.
[14] Pl.'s App. 82-83 at ¶¶ 5-6; Pl.'s App. 90-91 (29:16-30:4); Pl.'s App. 92-93 (33:2-34:15).
[15] Pl.'s App. 82-83 at ¶ 6.
[16] Pl.'s App. 83 at ¶ 7; Pl.'s App. 102 (16:3-15).

any given day.[17]  The drop in overtime sign-ups on February 10 confirmed the maintenance

directors' fears—AMFA and its membership had initiated a large-scale, coordinated refusal to

work overtime.[18]  This marked the beginning of an approximately ten-day job action, during

which a host of AMFA members refused to perform any overtime maintenance.[19]

      **1.**      **Statistical evidence of the job action.**[20]

Data regarding the level of overtime sign-ups at three of Southwest's largest maintenance

facilities (Dallas, Phoenix, and Chicago) from February 10 through February 20, 2017, illustrate

the effect of the concerted overtime refusal:

---

[17] Pl.'s App. 83 at ¶ 7; Pl.'s App. 88-89 (19:7-14, 19:24-20:5); Pl.'s App. 102-03 (16:24-17:9).
Under the parties' Collective Bargaining Agreement ("CBA"), the voluntary overtime system
operates in three steps:  first, mechanics sign up to indicate they are available to work overtime;
second, Southwest determines how many overtime shifts it will need to fill on a given day; and
third, Southwest contacts a set number of the mechanics who signed up for overtime to confirm
that they are available to work an available shift.  *See* Pl.'s App. 3 at ¶ 7; Pl.'s App. 6-14.
Southwest tracks statistics concerning each of these steps in careful detail.  *See* Pl.'s App. 109-11
at ¶¶ 3-10.  As discussed below, these statistics demonstrate the staggering nature of the unlawful
overtime boycott that prompted this lawsuit.
[18] Pl.'s App. 83 at ¶ 8; *see also* Pl.'s App. 106 (48:5-25).
[19] Pl.'s App. 83-85 at ¶¶ 8, 13.
[20] The statistics presented in support of this motion reflect Southwest's final assessment.
Southwest made an extraordinary effort to review and confirm the data guiding its evaluation of
a response to the job action.  Pl.'s App. 109-11 at ¶¶ 3-10.  Designated individuals tracked data
and then re-checked that data on a rolling basis to confirm that changes to the data after daily
overtime cutoffs were captured and reflected in modified reports.  Pl.'s App. 109-11 at ¶¶ 3-10.
As a result, the contemporaneous and ultimate compilations of this data not only capture the job
action—they demonstrate the care with which Southwest tracked and confirmed the data on
which it relied both during and after AMFA's disruptive and unlawful activities.



- In Dallas, **125** AMFA-represented mechanics signed up for overtime on February 9, but only **30** mechanics signed up for overtime on February 10.[21]

- In Phoenix, **58** mechanics signed up for overtime on February 9, but only **31** signed up for overtime on February 10, and that number continued to fall until February 18, when only **11** AMFA members signed up for overtime.[22]

- And in Chicago, **54** mechanics signed up for overtime on February 9, but only **16** mechanics signed up for overtime on February 10, and the number of sign-ups continued to decline until February 16, when only **7** AMFA members signed up for overtime.[23]

---

[21] Pl.'s App. 111-12 at ¶ 10; Pl.'s App. 169-71.
[22] Pl.'s App. 111-12 at ¶ 10; Pl.'s App. 182-84.
[23] Pl.'s App. 111-12 at ¶ 10; Pl.'s App. 179-81.

Whereas Southwest generally operates with at or near 100% overtime acceptance rates, AMFA members' level of overtime acceptance dropped as low as 10% during the February 2017 job action.[24]



### 2.    Other evidence of the job action.

Members of Southwest's leadership team observed other evidence of AMFA members' overtime refusal.  On February 14, 2017, a supervisor overheard Ken Hackett, a Southwest mechanic and AMFA Local 11 Shop Representative in Dallas, instructing other employees to not answer their phones if and when Southwest called them seeking to fill overtime shifts.[25]  Shortly thereafter, Southwest discovered that Hackett was in possession of a "scab list"—a document attached to Hackett's toolbox that listed the names of Southwest mechanics who had signed up for overtime on two dates in 2016; dates on which Southwest believes the Union attempted to orchestrate similar overtime refusals.[26]  Hackett's "scab list," which was titled "DAL Mechanic Overtime Acceptance List," featured images of bugs with the word "PARASITE" superimposed:

---

[24] Pl.'s App. 111-12 at ¶ 10; Pl.'s App. 169-71.
[25] Pl.'s App. 187-88 (141:22-142:23).
[26] Pl.'s App. 189-91 (239:8-18, 242:24-243:8).



Other employees—including AMFA members—spoke up about the Union's unlawful job action and limited response thereto.  On February 19, 2017, AMFA members Daren Douglas and Larry Francis sent an email and an attached letter to AMFA National Director Bret Oestreich, wherein Douglas and Francis stated that they wanted to "vent a bit about recent events."[27] Douglas and Francis stated:  "A week before the mechanics decided to do their group effort to avoid overtime signups, both Larry Francis and myself hit up [AMFA Local 11 President] Dale Dixon to discuss it with him."[28]  Douglas and Francis told Oestreich that they thought the ongoing overtime refusal was a bad strategic decision on AMFA's part, essentially arguing that AMFA's decision to engage in a job action made the Union appear "unprofessional."[29]  The letter continued:

> Instead of listening to our concerns, [Dixon] and the rest of the Union officers continued to allow this to go into effect and in the end, we have appeared to gain little to nothing. . . .  In effect the Union seems to have opened a sort of Pandora's box, subjecting us to further potential problems down the line.
>
> . . .
>
> Along with this whole issue is the fact that several members of our overall group had resorted to harassment during the time frame that this process went on.  It is unacceptable that our Union, who is supposed to be made up of responsible adults would allow this type of action to occur amongst our membership.  At no time, did I ever see any representatives work themselves amongst the membership to call this behavior out.[30]

---

[27] Pl.'s App. 204-06; Pl.'s App. 199 (55:2-11).
[28] Pl.'s App. 204-06.
[29] Pl.'s App. 204-06.
[30] Pl.'s App. 204-06.

During his deposition, Oestreich testified that he did not take any action to investigate or otherwise respond to the issues raised by Douglas and Francis in their February 19 letter.[31]

Recently, an AMFA member issued a Facebook post admitting to and describing AMFA's role in the February 2017 overtime refusal.[32]  The AMFA member wrote that, in February 2017, "[n]egotiations with SWA weren't continuing expediently enough for a minority (Angry 10%) of SWA AMTs and they devised a self-help work/job action."[33]

### 3.  The intended purpose of the job action.

The illegal overtime boycott that AMFA and its membership instigated arose in the context of more than five years of difficult—and often contentious—negotiations working toward a new CBA.  The parties' current agreement took effect on August 16, 2008, and became amendable on August 16, 2012.[34]  Since 2012, the parties have engaged in over fifty negotiation and mediation sessions.[35]  Since 2015, the parties have conducted their negotiations as formal mediation sessions under the auspices of the NMB, the federal agency tasked with assisting carriers and unions in resolving bargaining disputes in the railway and airline industries.[36]  The parties' next mediation session with the NMB is scheduled for March 6, 2018.[37]

Given these ongoing mediated negotiations, both Southwest and AMFA are statutorily prohibited from engaging in self-help—such as an employer lockout or an employee job action—until the parties' negotiations resolve in either a ratified contract or a "release" from negotiations by the NMB.  *See* 45 U.S.C. §§ 152 First, 156.  Despite this prohibition,

---

[31] Pl.'s App. 200 (60:1-5).
[32] Pl.'s App. 207-09.
[33] Pl.'s App. 207-09.
[34] Pl.'s App. 2-3 at ¶ 6.
[35] Pl.'s App. 2-3 at ¶ 6.
[36] Pl.'s App. 2-3 at ¶ 6.
[37] Pl.'s App. 2-3 at ¶ 6.

Southwest's directors believe—based on anecdotal and statistical evidence, including the evidence summarized above—that AMFA, AMFA Local 11, and the individual Defendants instigated and chose not to prevent or halt the February 2017 overtime refusal as a method of harming Southwest as leverage during collective bargaining.[38]

### D.      The Emergency Created by the Job Action

Southwest's maintenance directors regarded and treated the ongoing job action as a maintenance emergency, akin to a hurricane, blizzard, or other "mass grounding event."[39]  Most important to Southwest's leadership was ensuring that the daily flow of Southwest's aircraft maintenance was able to continue without extended interference caused by the lack of overtime man-hours.[40]  For example, Southwest's maintenance directors had to determine whether, in light of the ongoing overtime refusal, they had sufficient manpower to perform both short-term maintenance and longer-term maintenance, including extended aircraft maintenance checks known as "C-Checks."[41]  AMFA members' concerted refusal to work overtime threatened to impact each aspect of Southwest's maintenance program.[42]

The inherent complexity of maintenance in the airline industry leaves carriers such as Southwest particularly vulnerable to the effects of a union job action, such as an overtime refusal.  At Southwest, in the event of a job action such as AMFA's February 2017 overtime refusal, the company's maintenance directors immediately attempt to address manpower needs for short-term maintenance and unanticipated repairs to out-of-service aircraft, in order of

---

[38] Pl.'s App. 85 at ¶ 14.
[39] Pl.'s App. 83 at ¶ 8.
[40] Pl.'s App. 84 at ¶¶ 10-11.
[41] Pl.'s App. 84 at ¶¶ 10-11; Pl.'s App. 94-95 (46:24-47:3, 48:16-49:4).
[42] Pl.'s App. 83-84 at ¶ 9.

urgency, with a goal of minimizing or avoiding flight delays and cancellations.[43]  At the same time, Southwest cannot simply postpone longer-term maintenance work, such as C-Checks, because that would create a cumulative backlog of maintenance needs.[44]  In the airline industry, such a maintenance backlog can quickly lead to delays and cancellations.[45]

In most businesses, an employee-driven, concerted effort to refuse overtime might not present a major concern.  However, such activity creates a serious emergency in a schedule-driven, overtime-dependent business such as air travel.  Even a small disruption to the flow of maintenance work caused by inadequate overtime can trigger a ripple effect requiring the cancellation of multiple flights and creating even more delays—customer service failures that directly impact Southwest's bottom line, reputation, and goodwill.[46]

###    E.    Southwest's Response to the Job Action

Anticipating the debilitating effect that an overtime refusal would have on Southwest's operation, Southwest reached out to AMFA's National, Local, and legal representatives promptly after the job action began.  On February 10, 2017, Southwest sent letters to AMFA's legal counsel, AMFA's National Director (Defendant Oestreich), and the Presidents of AMFA's four Southwest locals.[47]  Through these letters, Southwest urged AMFA's National and Local leadership to prevent or to swiftly resolve any concerted refusal to work overtime by AMFA members.[48]  Southwest's letters also reminded AMFA that job actions—such as concerted

---

[43] Pl.'s App. 84 at ¶¶ 10-11.
[44] Pl.'s App. 84 at ¶ 10; Pl.'s App. 98 (72:13-24).
[45] Pl.'s App. 84 at ¶ 10.
[46] Pl.'s App. 84 at ¶ 10.
[47] Pl.'s App. 18-19; Pl.'s App. 3 at ¶ 8.
[48] Pl.'s App. 18-19; Pl.'s App. 3 at ¶ 8.

overtime refusals—are unlawful while the parties remain in collective bargaining and subject to mandatory mediation under the RLA.[49]

Also on February 10, 2017, Southwest issued a letter to all mechanics and related employees.  (Pl.'s App. 16; Pl.'s App. 3 at ¶ 8.)  That letter provided in part as follows:

> You are likely aware of an attempt by members of [AMFA] to discourage our Mechanics and Inspectors at various locations from volunteering to work overtime.  We consider such activity to be a job action intended to disrupt our operation. . . .  We understand the frustration with contract negotiations and share your disappointment.  Irrespective of where you stand, it's our responsibility to let you know that this effort would constitute a change in the status quo and violate the Railway Labor Act.[50]

Despite Southwest's February 10 letters, AMFA did not take immediate steps to address AMFA members' ongoing job action.[51]

When AMFA's overtime refusal continued into the weekend of February 11-12 and beyond, Southwest's short-term maintenance work fell significantly behind schedule.[52]  As a result, when the overtime refusal continued into the workweek beginning on Monday, February 13, Southwest began to shift C-Check mechanics to higher-priority areas.[53]  In this manner, AMFA's job action created a "snowball effect" of maintenance needs.[54]  Southwest determined that in order to prevent a backlog of aircraft maintenance, it needed to outsource some C-Checks to third-party vendors.[55]  Southwest did so at significant extra cost.[56]

---

[49] Pl.'s App. 18-19; Pl.'s App. 3 at ¶ 8.
[50] Pl.'s App. 16; Pl.'s App. 3 at ¶ 8.
[51] Pl.'s App. 85 at ¶ 14.
[52] Pl.'s App. 83-84 at ¶¶ 8-11.
[53] Pl.'s App. 83-84 at ¶¶ 8-11.
[54] Pl.'s App. 84 at ¶ 11.
[55] Pl.'s App. 84 at ¶¶ 10-11; Pl.'s App. 104-05 (41:12-42:6).
[56] Pl.'s App. 84 at ¶ 11.

F.     **Defendants' Failure to Prevent or Halt the Job Action**

AMFA, AMFA Local 11, and the individual Defendants took belated and minimal action to prevent or halt the job action once alerted by Southwest on February 10, 2017.  On February 12, 2017 (well after the overtime refusal had begun in earnest and about forty-eight hours after receiving notice from Southwest), AMFA issued a single electronic communication on its national website claiming that the Union leadership did not call for an overtime boycott and stating that determinations not to volunteer for overtime must be "made on an individualized basis."[57]  Although AMFA's letter is dated February 11, 2017, AMFA waited until February 12 to post the electronic version of the letter on the Union's national website.[58]  AMFA also posted the notice on Facebook and Twitter, and some AMFA members testified that they think the notice may have been posted on some physical bulletin boards at some maintenance facilities.[59]

AMFA's efforts to distribute its messages regarding the ongoing job action were minimal.  Although AMFA emailed the letter to certain members of AMFA's National leadership structure, AMFA did not send the February 12 letter to AMFA's Local Airline Representatives or the Area and Shop Representatives who report to them, to Local Vice Presidents, or to the Union's Local Safety and Standards Chairmen.[60]  Instead, AMFA purports to have relied—without objective reasons—on each Local's Secretary to disseminate AMFA's messages about the job action to Local personnel, including AMFA Shop Representatives and rank-and-file mechanics.[61]  From February 10 through February 16, 2017, this one letter and the limited posting/distribution efforts represented *the totality* of the Union's response to the

---

[57] Pl.'s App. 210-12; Pl.'s App. 194-95 (40:22-41:15).
[58] Pl.'s App. 65-66 (16:1-17:12).
[59] Pl.'s App. 198 (52:16-19) (stating that the letter was posted on "[t]he national website, Facebook, Twitter . . . I think that's it"); Pl.'s App. 217 (55:5-10) ("I believe this was posted on our AMFA communications board.").
[60] Pl.'s App. 71-72 (26:3-27:2).
[61] Pl.'s App. 75-77 (48:8-50:25).

ongoing, unlawful job action at multiple maintenance bases employing upwards of 2,400

mechanics represented by AMFA.  On February 16, 2017, after Southwest filed this lawsuit,

AMFA posted a second letter, all but two sentences of which were dedicated to disputing

Southwest's claims in this case.[62]

### III.    STANDARD

#### A.    Summary Judgment

Southwest moves for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure and Rule 56.3 of this Court's Local Civil Rules.  Under Federal Rule of Civil

Procedure 56, summary judgment is appropriate when, viewing the evidence in the light most

favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists,

and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c).  In considering a motion for summary

judgment, the district court must view the evidence "through the prism of the substantive

evidentiary burden."  *Deep Marine Tech., Inc. v. Conmaco/Rector, L.P.*, 515 F. Supp. 2d 760,

769 (S.D. Tex. 2007).  Mere speculation and unsubstantiated opinions will not suffice to defeat a

motion for summary judgment.  *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

A motion for summary judgment is the proper vehicle for resolution of Count III of

Southwest's Complaint because the factual dispute underlying Count III—the Union's unlawful

job action in violation of the status quo provisions of the RLA—is a "major dispute" capable of

judicial resolution under the RLA.  *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723

(1945); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307-08 (11th Cir.

2001) ("*Delta v. ALPA*") (holding that a dispute stemming from union members' concerted

---

[62] Pl.'s App. 222; Pl.'s App. 196-97 (48:17-49:12).

refusal to work overtime was a "major dispute" under the RLA).  This distinguishes Southwest's claims in this case from the Union's Counterclaim:  each aspect of AMFA's Counterclaim can be resolved by applying and interpreting the parties' CBA, and, accordingly, the Counterclaim is an arbitrable "minor dispute" over which this Court lacks jurisdiction.  *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299 (1989) ("*Conrail*").  In a separate filing, Southwest will move to dismiss AMFA's Counterclaim (and its three sub-allegations) for lack of subject matter jurisdiction.

### B.     Permanent Injunctive Relief

"Generally speaking, the standard for a permanent injunction is the same as the standard for a preliminary injunction except that, in the case of the former, the plaintiff must actually succeed on the merits rather than to merely show, as in the case of the latter, a likelihood of success." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 143 F. Supp. 2d 672, 688-89 (N.D. Tex. 2001) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)), *aff'd*, 286 F.3d 803 (5th Cir. 2002).  In the Fifth Circuit, the four prerequisites for the grant of an injunction are as follows:  (1) the plaintiff must prevail on the merits, (2) there must be a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted, (3) the threatened injury to the plaintiff must outweigh the threatened harm the injunction may do to the defendants, and (4) granting the injunction must not disserve the public interest.  *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  Here, however, because this case concerns a "major dispute" under the RLA, Southwest may obtain an injunction *without* satisfying the "irreparable injury" prong of the injunction analysis.  *See, e.g.*, *Conrail*, 491 U.S. at 303; *US Airways, Inc. v. U.S. Airline Pilots Ass'n*, 813 F. Supp. 2d 710, 735-36 (W.D.N.C. 2011) ("[I]n the context of a 'major' dispute under the RLA such as that presented here, district courts have subject-matter jurisdiction to enjoin a violation of the status

quo pending completion of the required procedures, without the customary showing of irreparable injury." (footnote omitted)).  As demonstrated below, Southwest has satisfied the standard for issuance of a permanent injunction on Count III of its Complaint.

**IV.**    **ARGUMENT**

Under the RLA, labor unions have an "affirmative legal duty" to attempt to prevent and eliminate unlawful job actions that disrupt interstate transportation.  *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d 349, 363 (7th Cir. 2001) ("*United v. IAM*").  Pursuant to that duty, unions are "statutorily bound to do everything possible to 'maintain' the CBA so that commerce is not in any way interrupted."  *Delta v. ALPA*, 238 F.3d at 1310.  This includes the "duty to end [an] unlawful action," such as a concerted overtime refusal.  *Id.* at 1310 n.22.  Here, the undisputed evidence establishes that Defendants failed in their duty to end, or at the very least try to end, the unlawful overtime boycott initiated on or about February 10, 2017.  As a result, the Court should grant Southwest's motion for partial summary judgment as to Count III.

**A.**    **Defendants' Deficient Actions Violate the Core Provisions of the RLA Intended to Preserve and Protect Interstate Transportation**

Defendants violated RLA Section 2, First, by failing to take the affirmative steps necessary to prevent or halt their members' unlawful overtime refusal in February 2017.

**1.**    **Defendants' issuance of a single, ineffective communication does not satisfy the RLA's "every reasonable effort" standard.**

Congress's principal purpose in passing the RLA was to "provide a machinery to prevent strikes" in order to "safeguard the vital interests of the country" in uninterrupted transportation service.  *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930).  Indeed, the first stated goal of the RLA is to "avoid any interruption to commerce or to the operation of any carrier engaged therein."  45 U.S.C. § 151a(1); *see also Airline Prof'ls Ass'n, Teamster Local*

*Union 1224 v. ABX Air, Inc.*, 400 F.3d 411, 413 (6th Cir. 2005). To achieve that goal, the RLA imposes an express duty upon all carriers and their officers, agents, and employees to "exert every reasonable effort to make and maintain agreements . . . and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier." 45 U.S.C. § 152, First. The Supreme Court has stated definitively that this duty lies at the "heart of the Railway Labor Act." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-78 (1969).

The Section 2, First, duty is not a "mere exhortation." *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 574 (1971). Instead, the Section 2, First, obligation requires unions to take affirmative, aggressive, and timely action to end work disruptions prior to NMB release. *Delta v. ALPA*, 238 F.3d at 1309 n.22 ("The duty of [the union] under the RLA is sufficiently high that even if it has not sponsored or ratified the unlawful job action by the [employees], it has a duty to end such unlawful action.").

Under this standard, issuing one or more written directives for employees to cease a job action is not enough. In *Delta v. ALPA*, the Eleventh Circuit held that ALPA could not avoid liability under Section 2, First, by pointing to a handful of ineffective communications it had made to its pilots: "It is possible, of course, that ALPA has in fact done all that it can do in directing the pilots to cease their no-overtime campaign. We seriously doubt this is the case, however. What seems to be true is that while ALPA has admonished its members at Delta's request, it has not made 'every reasonable effort' as required by statute." *Id.* at 1309.

Similarly, in *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009) ("*United v. ALPA*"), the U.S. Court of Appeals for the Seventh Circuit held that issuing an ineffective communication was not enough to satisfy the RLA's "every reasonable effort"

requirement.  In *United v. ALPA*, the U.S. Court of Appeals for the Seventh Circuit held that

ALPA violated RLA Section 2, First, by failing to engage in a good-faith effort to end a union

"sick-out," whereby union members concertedly called in sick in an effort to damage United's

operations.  *Id.* at 270-71.  After reviewing the factual record presented by the parties, the court

found that, instead of engaging in legitimate efforts to end the job action, ALPA had merely

distributed a single, "surprisingly ineffective" letter.  *Id.* at 271.  The district court in *United v.*

*ALPA* also determined that "none of ALPA's publications [regarding the overtime refusal] . . .

were direct, forceful, or sincere attempts to discourage the sick-out."  *United Air Lines, Inc. v.*

*Air Line Pilots Ass'n, Int'l*, No. 08 CV 4317, 2008 WL 4936847, at \*38 (N.D. Ill. Nov. 17,

2008), *aff'd*, 563 F.3d 257 (7th Cir. 2009).

Here, the undisputed evidence demonstrates that—apart from the issuance of a single,

ineffective letter on its national website, Facebook, and Twitter—Defendants did not exert *any*

legitimate effort, let alone "every reasonable effort," to prevent or terminate the unlawful

overtime refusal.  AMFA's National apparatus did nothing of substance to halt the ongoing job

action, and AMFA's four Locals similarly evinced an unwillingness to take reasonable steps to

halt, or even to mitigate, AMFA members' overtime refusal.  Accordingly, because Defendants'

failure to exert every reasonable effort constitutes a violation of RLA Section 2, First, the Court

should grant summary judgment in Southwest's favor on Count III.

> **2.    AMFA's National and Local leadership failed to coordinate an appropriate response to the overtime refusal.**

The disconnect between AMFA's National leadership (which authored the February 12,

2017 letter regarding AMFA members' overtime refusal) and the Union's Local Airline

Representatives (who are most able to exert control over AMFA's Area and Shop

Representatives and rank-and-file mechanics) is glaring.  As noted, in their contemporary email

-18-

to AMFA's National Director, AMFA members Daren Douglas and Larry Francis wrote that "at no time" did they see any of AMFA's Local Airline Representatives taking affirmative steps to address AMFA members' unlawful overtime refusal.  (Pl.'s App. 204-06)  When asked whether any AMFA Local Airline Representative conducted a review or investigation to ensure compliance with AMFA's February 12, 2017 letter, National Director Bret Oestreich admitted that he was "not aware . . . if they did or not."  (Pl.'s App. 63-64 (11:10-12:11).)

Michael Young, who served as the Airline Representative for AMFA Local 32 in Phoenix, testified that he did not communicate with any of the officers, representatives, or rank-and-file mechanics in his region after receiving AMFA's February 12, 2017 letter regarding the ongoing overtime refusal.  (Pl.'s App. 49-52 (85:4-88:13).)  Yet Young is responsible for the Area and Shop Representatives who provide on-the-ground representation for Southwest mechanics in Phoenix.  When asked whether he took *any* "specific steps or actions" after seeing the Union's February 12 letter, Young responded, "No, I don't recall."  (Pl.'s App. 52 (88:9-13).) Young's failure to take affirmative action to halt his Local's participation in the job action is jarring because Young also testified that he exercises total, independent decision-making authority with regard to Local 32 and its 291 Phoenix-based mechanics.  (Pl.'s App. 48 (29:3-6).) Similarly, there is no indication that any AMFA member took affirmative steps to prevent or halt the job action at Southwest's Chicago maintenance facility, which was also heavily affected by AMFA's overtime refusal.  (Pl.'s App. 111-12 at ¶ 10; Pl.'s App. 179-181.)

The deficiencies in AMFA's response to the job action were most pronounced at Southwest's largest maintenance facility in Dallas, which is staffed by approximately 740 mechanics affiliated with AMFA Local 11.  Deposition testimony from Local 11's President, Secretary, and Airline Representative encapsulates AMFA's failure to exert a reasonable effort

to combat the job action.  As noted, AMFA's National apparatus purportedly relied on each Local's Secretary to distribute AMFA's February 12, 2017 letter.  (Pl.'s App. 75-77 (48:8-50-25).)  But AMFA Local 11's Secretary, Frank Suentzenich, testified that he posted AMFA National's letter to Local 11's website and then took *no additional action*.  (*See* Pl.'s App. 224 (95:6-9) (testifying that he took no other steps to suppress the ongoing job action because, "Once the letter was up, the letter is up.").)

When asked whether any *other* representative of AMFA Local 11 took steps to halt the job action, Suentzenich testified, "I think Dale [Dixon, AMFA Local 11 President] walked around and talked to people or attempted to."  (Pl.'s App. 224 (95:10-15).)  Dixon, in turn, testified that when he spoke to some AMFA members during the job action, the members told him they were frustrated with the status of contract negotiations and said "nothing other than that."  (Pl.'s App. 218-19 (58:1-59:8).)  Dixon also testified that he did not communicate with Local 11's Shop Representatives because that responsibility falls to Airline Representative Craig Hamlet.  (Pl.'s App. 215-16 (52:21-53:11).)

But, in his deposition, Hamlet testified that he did not communicate the February 12 letter to *any* members of his Local, including all of the Local 11 Shop and Area Representatives, because "I'm not a part of that distribution chain."  (Pl.'s App. 28-29 (72:17-73:19).)  Finally, Local 11 Shop Representative Ken Hackett—the employee who was overheard directing AMFA-represented mechanics to not answer their phones if Southwest called them seeking to fill overtime shifts—testified that *no one* at AMFA asked him to convey any message during the job action about the ongoing overtime refusal to AMFA's rank-and-file mechanics.  (Pl.'s App. 228-30) (41:10-43:15).)

AMFA's response to the overtime refusal in Dallas demonstrates the inadequacy of the Union's response to the February 2017 job action under the law.  Sending out a blast email from AMFA National or posting something on the National website—or hoping that someone at the Local level will post it on another website—is perhaps the minimal amount of effort the Union could have exerted to stop the unlawful job action.  This is particularly true in this case because, as AMFA representatives testified, the Union knows that not all of its mechanics visit the Union's National website and that not all mechanics provide their email addresses to the Union for purposes of receiving mass emails.  (Pl.'s App. 36-42.)  Also noteworthy is the fact that, at deposition, representative after representative testified that they did not bother to check the overtime sign-up statistics to determine for themselves whether an overtime boycott was occurring.  (*See* Pl.'s App. 214 (46:10-14); Pl.'s App. 30 (78:11-13); Pl.'s App. 73 (35:10-15) ("Q: Did anyone at AMFA, to your knowledge, review the overtime sign-up for the week of February 10 in Dallas? . . . A: Not to my knowledge, no.").).  Put differently, Defendants did not engage in *any* reasonable efforts to diffuse the job action—much less engage in *all* reasonable efforts as required under the RLA.

Even now, after a full year of litigation, months of written and document discovery, and twenty witness and corporate depositions, there still exists no record evidence of any legitimate efforts by Defendants to prevent or halt the job action besides a blast email and website posting forty-eight hours after the job action started.  At the Local level, there is no record evidence that AMFA's Local Airline Representatives, Area Representatives, or Shop Representatives—the individuals within AMFA's organizational structure who were in the best position to act—took any meaningful action between February 10 and February 20 to stop the ongoing overtime

refusal or were even told to take some action.  Defendants' collective actions—or lack thereof—are violations of the RLA.

### 3.      Multiple other available steps were totally ignored by Defendants.

Critically, at no point did Defendants take any of the following reasonable steps—steps the Union could have pursued as noted in prior judicial opinions on the Section 2, First duty:

- Ensure that the February 12, 2017 letter was *physically posted* on all Union bulletin boards at all stations with AMFA mechanics;

- Distribute the letter, in person, to mechanics when arriving at work, leaving work, or on break;

- Instruct the four Airline Representatives to hold emergency meetings with all Area and Shop Representatives, in person and/or via telephone, to timely discuss the job action and how to cease it;

- Instruct all Airline Representatives, Area Representatives, and Shop Representatives at each station to hold emergency meetings before or after work shifts, or during breaks, with all mechanics to inform them to cease the job action;

- Initiate a phone tree system to leave messages with any mechanic that could not or did not participate in any in-person meeting with an Airline Representative, Area Representative, or Shop Representative;

- Investigate which AMFA members were, in fact, orchestrating or encouraging the overtime boycott among other members; and/or

- Pursue internal union fine or sanction procedures for noncompliance with AMFA directives relating to the job action.

Southwest is not arguing that Defendants necessarily, as a matter of law, should have done all of the above.  But, by doing *none* of the above and taking no other material action, Defendants failed in their RLA-imposed duty to exert reasonable efforts to stop the job action.

It is important to remember that Southwest has alleged, under Counts I and II, that AMFA officers and agents did, in fact, orchestrate or condone this overtime boycott.  But as noted, a carrier can obtain legal and injunctive relief against a union even if there is a lack of direct evidence that the union "authorized" or "ratified" the job action.  That is the basis for Count III and this summary judgment motion.  For purposes of establishing liability under Section 2, First, "[i]t is enough that the union fail 'to exert every reasonable effort to prevent or discourage a strike or a concerted work action.'"  *US Airways*, 813 F. Supp. 2d at 731 (quoting *United v. ALPA*, 563 F.3d at 268).

Because there is no genuine dispute as to any material fact regarding the Union's failure to exert every reasonable effort to prevent or halt AMFA members' overtime refusal, the Court should grant Southwest's motion for partial summary judgment on Count III and should enjoin the Union and its agents from engaging in any further job activity and impermissible self-help.

### B.    Southwest Is Entitled to Injunctive Relief

In furtherance of the RLA's policy goals and in light of the RLA's total proscription on self-help when under NMB mediation, the RLA authorizes federal courts "to enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,'" such as refusal to work overtime.  *United v. IAM*, 243 F.3d at 362 (quoting *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)).  For the following reasons, Southwest meets each of the four requirements for injunctive relief.

**1.     Southwest is entitled to judgment in its favor on the merits of its Section 2, First, claim against AMFA and the individual Defendants.**

As demonstrated above, Southwest should succeed on Count III of its Complaint because the undisputed evidence demonstrates, beyond question, that Defendants failed to exert every reasonable effort to prevent or halt AMFA members' overtime refusal.  When, as here, a court determines that a concerted work activity has occurred in violation of the RLA, and that a union has failed to take reasonable efforts in response, "an injunction can issue ordering the union to observe its statutory duty by trying to stop it."  *United v. IAM*, 243 F.3d at 363.  Southwest thus satisfies the first prong of the injunction analysis.

**2.     Although not required to do so, Southwest can show that it will suffer irreparable injury absent injunctive relief.**

In order to obtain injunctive relief under the RLA, Southwest is *not* required to demonstrate that it would suffer irreparable injury absent an injunction issuing.  *See, e.g.*, *Conrail*, 491 U.S. at 303 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.").  Because Southwest has demonstrated that Defendants violated the RLA's Section 2, First, obligations, the Court should issue a permanent injunction without further analysis on this element.

Even so, Southwest would still be able to meet this element of the traditional injunction analysis.  Although the Union's job action has ceased, the threat of future job actions—be they overtime refusal or some other form of self-help—very much continues.  The parties remain in the midst of contentious bargaining negotiations that have lasted over five years, and, even in the weeks prior to this filing, AMFA has continued to publicize its anti-Southwest rhetoric.  If the Union were to engage in another willful job action, the financial effect on Southwest's business could be catastrophic.  The potential damage also could result in incalculable loss of customer

goodwill that occurs when flights are delayed or cancelled because of labor strife.  (Pl.'s App. 84 at ¶ 10.)

Here, AMFA has already demonstrated its willingness to engage in unlawful self-help in violation of the RLA in both 2016 and 2017.  The Union should not be given another opportunity to do so without ongoing judicial oversight through this current bargaining round, given its recent behavior.

### 3.      The balance of the equities weighs heavily in Southwest's favor.

No "harm" would befall the Union were this Court to issue an injunction because an injunction would merely require Defendants to abide by the law.  A permanent injunction requiring AMFA and its National and Local leadership to preserve the status quo without engaging in unlawful "self-help" would be nothing more than an order mandating that the Union satisfy its statutory responsibilities under the RLA.  Conversely, as noted, Southwest and the flying public could suffer a potentially catastrophic level of harm should the Court not issue permanent injunctive relief and should AMFA and/or its membership think that they can repeat the same, or worse, behavior in the future.

Further, there is no merit to Defendants' anticipated argument that an injunction would subject AMFA members to legal liability for the good-faith reporting of legitimate maintenance issues.  The injunctive relief that Southwest is seeking would not require AMFA members to ignore or to refrain from reporting legitimate mechanical issues.  This is a well-worn union argument, often asserted in an effort to avoid what would otherwise be common-sense injunctive relief.  But here, an injunctive order requiring AMFA to refrain from engaging in unlawful job actions, including impermissible "work-to-rule" slowdowns, would have no effect on mechanics' legitimate exercise of their professional judgment and discretion.

### 4.   Absent injunctive relief, future Union job actions are likely to harm the general public.

More important than the likely harm to Southwest in the absence of an injunction is the potential damage a future AMFA job action would do to the traveling public. The very purpose of the RLA is to "avoid any interruption to commerce," 45 U.S.C. § 151a, including commercial travel. Southwest is the largest air carrier in the United States in terms of domestic passengers boarded, and an AMFA job action resulting in flight cancellations would interrupt travel for citizens across the country. Absent an injunction, Defendants will be free to use Southwest's passengers as leverage in an ongoing bargaining dispute. That is precisely what the RLA was enacted to avoid. For these reasons, the Court should grant Southwest's motion and should issue a permanent injunction prohibiting the Union from engaging in future job actions.

### 5.   The Court should issue a prospective injunction that prohibits AMFA from engaging in any further unlawful job actions.

Should the Court grant Southwest's request for injunctive relief, Southwest respectfully proposes that the Court utilize prospective injunction language (presented in full in the accompanying proposed order) that is narrowly tailored but also sufficiently fulsome to protect against further unlawful job actions during the pendency of collective bargaining negotiations. Specifically, Southwest seeks an injunction prohibiting Defendants from engaging not only in additional overtime refusals, but also in other types of unlawful job activity, such as sick-outs, slowdowns, and so-called "work-to-rule" campaigns. Southwest respectfully requests that this injunction remain in effect until the earlier of (A) the date that AMFA members formally ratify a new CBA between the Union and Southwest or (B) thirty days after the NMB releases Southwest and AMFA from mediation, at which time the RLA permits the parties to engage in self-help.

Without an injunction from this Court, Southwest would be forced to file a new lawsuit every time AMFA chooses to seek bargaining leverage at the expense of Southwest's customers

and operations.  That is why, in this case, prospective injunctive relief is so vital to protect

Southwest's interests.  Unlike a prospective injunction, "an after-the-fact injunction cannot

prevent the 'interruption of commerce' that will have occurred during [the job action]," and

"stopping such disruption is, as we have seen, the main purpose of the RLA." *Burlington N. &*

*Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 286 F.3d 803, 808 (5th Cir. 2002) (citing 45

U.S.C. § 152, First).  Further, "after-the-fact injunctions would not give [a union] any incentive

to refrain from illegal strikes in the first place, because [the union] still would receive the benefit

of any damage to the carriers inflicted before the injunction went into effect." *Id.*

### C.   The Norris-LaGuardia Act Does Not Limit Southwest's Potential Relief

The Norris-LaGuardia Act ("NLGA"), a labor reform law passed in 1932, is generally

applicable to motions for injunctive relief in labor-relations disputes.  29 U.S.C. §§ 101 et seq.

Under certain circumstances, before a federal court may issue an injunction in a labor dispute,

the NLGA requires that the court hold "a hearing in open court for the taking of testimony of

witnesses in support of the allegations of the complaint, and testimony in opposition thereto, if

offered, and that specified findings of fact be made." *Burlington N. & Santa Fe Ry. Co.*, 143 F.

Supp. 2d at 689.

Those requirements are not applicable in this case, however, because the evidence

presented on this motion for summary judgment is reliable and undisputed, and because the

specific provisions of RLA Section 2, First, take precedence over the general requirements of the

NLGA.  *See, e.g.*, *Delta v. ALPA*, 238 F.3d at 1307; *In re Northwest Airlines Corp.*, 483 F.3d

160, 177 (2d Cir. 2007) ("The Norris-LaGuardia Act does not preclude courts from enforcing the

mandates of the RLA by issuing anti-strike and anti-lockout injunctions in appropriate

circumstances." (citing *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 445 (1987))).[63]

"In seeking to accommodate the conflicting provisions of the RLA and the NLGA, the Supreme Court has held that where a challenged action violates specific provisions of the RLA (such as the status quo provision of 45 U.S.C. § 152, First) . . . courts can issue injunctions to enforce the RLA provisions at issue notwithstanding the NLGA." *United v. IAM*, 243 F.3d at 362 (citations omitted) (quoting *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 490, 513 (1989)). Accordingly, the anti-injunction provisions of the NLGA do not apply to this dispute, and do not limit in any way the Court's ability to grant Southwest's request for injunctive relief.

Furthermore, because the reliability of the facts relevant to Southwest's motion for summary judgment on Count III is undisputed, the "hearing in open court" requirement of the NLGA, 29 U.S.C. § 107, is not necessary. In *Delta v. ALPA*, the Eleventh Circuit held that strict adherence to the NLGA's "hearing requirement" was not warranted because there "was no dispute about the reliability of the evidence, at least as to the concerted action by the pilots." 238 F.3d at 1311. Where the reliability of summary judgment evidence is undisputed, a district court is "entitled to rely upon such evidence to make its determinations" regarding the appropriateness of injunctive relief, without the NLGA's evidentiary hearing. *Id.* "The purpose of section 107

---

[63] *See also* 51B C.J.S. *Labor Relations* § 1068 (Dec. 2017) ("[W]hen a specific provision of the RLA imposes a substantive duty upon carriers and their employees to make and maintain agreements in such a way so as to avoid any interruption to commerce or the operation of any carrier, and where there is no other effective way to enforce the RLA, the [NLGA] does not prohibit a federal court from issuing an appropriate injunction; when the public interest, commerce, and a clear statutory provision are implicated, the courts will not shy away from holding the parties to their duties under the RLA so as to avoid any interruption to commerce.").

[of the NLGA] is served if the evidence is inherently reliable and there is no harm to the parties."
*Id.*

Here, there should be no dispute that an overtime boycott occurred.  And there should be no factual dispute that Defendants took belated and minimal action to stop it.  The factual record developed through discovery proves both points, and makes a judicial "hearing" on one or both items for Count III unnecessary.

## V.      CONCLUSION

AMFA, its leadership, and its membership broke the law in an effort to bring Southwest's operations to a halt.  When confronted with their membership's misconduct, Defendants failed to do what the law required.  Instead, they exposed Southwest to a ten-day maintenance emergency that resulted in hundreds of thousands of dollars in unnecessary expenses.  In light of these actions, Defendants are liable for violating RLA Section 2, First.  Accordingly, the Court should grant Southwest's motion and enter summary judgment on Count III based on the factual record and law.

Dated: March 1, 2018

Respectfully submitted,

*/s/ Ann Marie Arcadi*

Ann Marie Arcadi
Bar No. 00786994
Michael A. Correll
Bar No. 24069537
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
annmarie.arcadi@morganlewis.com
michael.correll@morganlewis.com
Tel: 214-466-4000
Fax: 214-466-4001

Thomas E. Reinert, Jr.
(pro hac vice)
David R. Broderdorf
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, DC  20004
thomas.reinert@morganlewis.com
david.broderdorf@morganlewis.com
Tel: 202-739-3000
Fax: 202-739-3001

*Attorneys for Plaintiff Southwest Airlines Co.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served upon all counsel of record in accordance with the Federal Rules of Civil Procedure on this 1st day of March, 2018, as follows:

Mark D. Tillman
Jackson P. Mabry
TILLMAN BATCHELOR LLP
Tower 1320
1320 Greenway Drive, Suite 830
Irving, TX 75038
Telephone: (214) 492-5720
Fax: (214) 492-5721
Mark.tillman@tb-llp.com
Jackson.mabry@tb-llp.com

Nicholas Granath
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
2915 Wayzata Blvd.
Minneapolis, MN 55405
Tel.: (612) 341-9080
Fax: (612) 341-9079
ngranath@ssmplaw.com

Lucas Middlebrook
199 Main Street, Seventh Floor
White Plains, NY 10601
Tel.: (914) 997-1346
Fax: (914) 997-7125
Lmiddlebrook@ssmplaw.com


*/s/ Ann Marie Arcadi*
Ann Marie Arcadi